■ WINSTON ALLEN et al., Respondents, v MURRAY HOUSE OWNERS CORP., Appellant, et al., Defendant.—Judgment of the Supreme Court, New York County (Carol H. Arber, J.), entered on April 23, 1990, which, upon a jury verdict in favor of plaintiffs and against defendants, awarded plaintiffs the sum of $2,975,606 in compensatory damages with interest thereon, $500,000 in punitive damages, and costs and disbursements, is unanimously reversed on the law and the complaint dismissed, with costs and disbursements. Therefore, the appeal from the order of the Supreme Court, New York County (Carol H. Arber, J.), entered on December 4, 1990, is dismissed as academic, without costs or disbursements. The Clerk is directed to enter judgment in favor of defendant-appellant, severing and dismissing the complaint as against it.

This appeal arises out of a jury verdict in favor of plaintiffs

Winston and Ruby Allen against defendant Murray House Owners Corp., a residential cooperative corporation, in the amount of $2,975,606 in compensatory damages and $500,000 in punitive damages plus interest from the date of entry. In that regard, plaintiffs brought suit against defendant as a result of the latter's refusal to issue new stock certificates in plaintiffs' name until the payment of certain late charges assessed by the board. The background to the dispute between the parties herein is as follows:

In March of 1981, a building located at 220 Madison Avenue and known as Murray House, converted to cooperative ownership under a non-eviction plan. The sponsors, David and Dorothy Goldstick, retained the shares allocated to apartments occupied by persons who had elected not to purchase their apartments, and the next year David Goldstick transferred his ownership interest to his wife. Plaintiffs thereafter entered into contracts with Dorothy Goldsticks giving them options to buy the stock for the unsold twenty-seven apartments; two of the units were evidently intended for the personal use of the Allens and the remaining twenty-five were earmarked for investment syndication. Although Winston Allen expected to organize and represent the syndicates himself, for which he anticipated earning management fees and brokerage commissions, his proposal was never implemented, apparently due, among other factors, to unfavorable changes in the income tax law, and he eventually acquired the shares in his own name rather than on behalf of Equity Properties, Ltd., his wholly owned corporation.

Accordingly, he obtained a loan commitment from Citytrust, a Connecticut institution, to cover the purchase price of approximately $1.7 million, as well as for a credit line of more than $500,000 to protect him against possible cash flow deficiencies attributable to maintenance obligations and interest that would exceed rent payments from occupying tenants. The closing on the deal occurred on June 28, 1985, and plaintiffs received the seller's stock certificates, duly endorsed, the proprietary leases and all other indices of good and marketable title. They then began to collect the rents from the tenants of the apartments involved.

While the purchase agreements required that Dorothy Goldstick furnish stock certificates registered in such names as requested by the buyers at least two days before the closing, there was apparently no demand for this by plaintiffs. Nonetheless, they did ultimately ask defendant Murray House Owners Corp. to issue new stock certificates (Winston Allen

stated that he first communicated the request in July of 1985 whereas defendant asserted that he did not do so until September of that year). In September of 1985 Citytrust delivered to Shari Felix, an employee of defendant Cross & Brown, the building's managing agent, the certificates that it held as collateral, as well as the sale documents, which she forwarded to the corporation's attorney, Edwin Ostrow, for his review and approval. Ostrow instructed her to prepare and have executed the "Acceptance and Assignment of Proprietary Lease" and then provide substitute certificates in plaintiffs' names. She thereupon readied the certificates and sent them to Murray House's president for signature. After he had returned the signed documents to Felix, the latter, following her standard practice, checked with the individual responsible for collections and was apprised that late charges totaling $2,850 remained outstanding. She informed both the corporation's president and Ostrow of this fact and was advised by the lawyer not to convey the certificates until the late charges were paid.

However, the board at some point voted to waive payment of the late charges, and the certificates were issued on December 5, 1985, some five weeks subsequent to the commencement of the instant action. It should be noted that Felix purportedly failed to specify to plaintiffs the amount owed, plaintiffs have denied prior knowledge of the existence of late charges, and there appears to be some confusion concerning the precise date that the cancellation of the charges actually occurred.

Plaintiffs' complaint alleged that Murray House Owners Corp. and its managing agent wrongfully claimed that they and/or their predecessors were liable for certain late charges and assessments, that defendants thereby unreasonably and unlawfully refused to transfer the shares, and, as a consequence thereof, plaintiffs have been unable to sell, transfer, refinance, sublet or rerent the apartments, causing them substantial additional expenses and significant injury to their business reputation and standing in the financial community. Moreover, they sought to recover as damages the total amount owed by them to Citytrust, costs incurred in attempting to syndicate the units, legal and other fees, and the negative cash flow generated by the difference between the rents received and the maintenance paid.

At trial, plaintiffs contended that the real reason that Murray House declined to issue new certificates was not, as urged by defendants, the unpaid late charges but, rather, racial bias and Winston Allen's unwillingness to commit his

proxy vote to the re-election of the incumbent board of directors, instead insisting on personally participating in shareholders' meetings. Thus, Winston Allen asserted, at one of these meetings, he was told by two of the officers that various stockholders had complained about a black person owning so many unsold shares because that could lead to the building becoming "ghettoized" and, further, that they had expressed concerns that a restaurant maintained on the commercial premises was becoming a "rib joint" and attracting an undesirable clientele. These allegations of prejudice against blacks were based strictly upon hearsay and were strongly denied by defendants, who also disputed demanding plaintiffs' proxy in exchange for the certificates; they pointed to the existence of other black residents and members of the board of directors. Yet, even assuming that plaintiffs were indeed exposed to negative racial comments, the fact remains that there was simply no proof, except for Allen's unsupported claims, that the absence of the subject certificates in any way interfered with his title to the property or his ability to market the apartments.

It is clear that plaintiffs' ownership of the units was no less valid prior to the issuance of the certificates than it was afterwards, and their title to the units was never in the least challenged. Since a conversion has been defined as the denial or violation of the dominion, rights or possession of another's property *(Sporn v MCA Records,* 58 NY2d 482, 487), and plaintiffs at all times possessed and exercised the prerogatives of ownership, no conversion by defendants of plaintiffs' property ever took place. Equally significant, there was no evidence introduced that, except for defendants' wrongful and unwarranted refusal to issue stock certificates in plaintiffs' names, they would have been able to dispose of the apartments and were prevented from doing so, even in part, by the supposed alienation of title caused by defendants' misconduct.

On the contrary, an examination of the record herein reveals that plaintiffs' case amounted to little more than speculation that if only they had had at hand the new stock certificates, they would surely have been able immediately to dispose of the apartments irrespective of conditions in the real estate market, the deleterious impact of the recent federal tax amendments, or the continued occupancy of the units by rent regulated tenants. There is, moreover, no indication that the short delay involved in obtaining the certificates was responsible for any added expense or loss of profit to plaintiffs, much less millions of dollars worth, or even that the apartments had

depreciated in value between September of 1985 and early December of that same year. Indeed, plaintiffs' own expert witness, while unable to assess the worth of the apartments in 1985 or 1986, supplied an appraisal for 1989 that demonstrated a significant increase in value. Plaintiffs themselves, on occasions after the happening of the supposed wrong, estimated the units at substantially higher amounts than they had paid for them, as shown by their various financial statements, certainly contradicting the notion that they were damaged by defendants' wrongful withholding. Amazingly, plaintiffs seem never to have considered the possibility of merely paying the relatively minor late charges demanded by Murray House Owners Corp., procure the stock certificates (rather than incur the millions of dollars in damages which they suggest that they suffered) and then contest the propriety of these charges. In any event, the law is settled that a party is under a duty to mitigate damages *(Wilmot v State of New York,* 32 NY2d 164, 168-169), and plaintiffs made no discernible effort in that direction.

Not only is the record devoid of proof of any monetary damage to plaintiffs, but the corporation's imposition of late charges and its decision to refrain from providing new certificates pending the payment of these charges was well within the business judgment rule enunciated by the Court of Appeals in *Matter of Levandusky v One Fifth Ave. Apt. Corp.* (75 NY2d 530). As the court declared therein, so long as the directors of a cooperative or condominium board have acted in good faith, in the exercise of honest judgment and without breaching their fiduciary obligation to the common and general interest of the corporation, judicial review to examine their determinations is not available. In the present situation, the proprietary leases, in their original form, authorized the assessment of late charges, and the corporation's by-laws at all times permitted Murray House to refuse consent to a transfer of shares until the satisfaction of any outstanding indebtedness. Additionally, article II, section 8 of the by-laws allowed the board to adopt or amend reasonable rules applicable to the building, and the corporation first enacted a late charge in November of 1981. Plaintiffs' attempt to avoid the unambiguous holding of *Matter of Levandusky v One Fifth Ave. Apt. Corp. (supra)* by endeavoring to establish bad faith (that is, the existence of racial basis and the effort to coerce them into bestowing their proxy votes) was refuted by the clear evidence that, whatever may have been the personal views of some of the other owners in the building, defendants

acted in reliance upon the advice of counsel *(see, Gordon v Nationwide Mut. Ins. Co.,* 30 NY2d 427, *cert denied* 410 US 931).* Consequently, plaintiffs have not met their burden of demonstrating wrongful conduct such as would warrant the imposition of liability upon the corporation or its managing agent. The judgment in plaintiffs' favor should, thus, be reversed and the complaint dismissed. Under these circumstances, it is unnecessary to reach defendants' arguments concerning a series of errors purportedly committed by the trial court. Concur—Murphy, P. J., Milonas, Ellerin, Ross and Rubin, JJ.